# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

VELIBOR DIVKOVIC,
      **Plaintiff**

         **v.**

THE HERSHEY COMPANY,
KRISTI UMBERGER, JOHN DOE 1,
and INDIVIDUAL JOHN DOE 2,
      **Defendants**

No. 1:21cv1947

(Judge Munley)

## MEMORANDUM

Before the court for disposition is the motion for summary judgment filed by Defendants The Hershey Company, Kristi Umberger, John Doe 1 and Individual John Doe 2 in this case alleging employment discrimination. The parties have briefed their respective positions and the matter is ripe for disposition.

## Background

Defendant Hershey Company is a corporation headquartered in Hershey, Pennsylvania. (Doc. 33, Defs' Stmt. Of Mat. Facts ("SOF") ¶ 1).[1] Hershey hired Plaintiff Velibor Divkovic on September 18, 2017 as a Production Operator in its Reese Plant. (Id. ¶ 2).

---

[1] Unless otherwise noted, the court cites to the Defendants' SOF for facts that plaintiff does not dispute.

Defendant Hershey had a Family and Medical Leave Act ("FMLA") policy establishing procedures and guidelines by which employees apply for and receive leaves of absence from employment pursuant to the FMLA.[2]  (Id. ¶ 4).

From September 2018 through August 2020, plaintiff submitted various FMLA requests for his own health conditions, gout flare ups, anxiety, and depression.  (Id. ¶¶ 15-22).  Plaintiff took personal FMLA leave on approximately thirty-four (34) days in 2020.  (Id. ¶ 23).

Plaintiff's wife, Barbara Divkovic, began working for Defendant Hershey in July 2020.  (Id. ¶ 25).[3]  On February 10, 2021, plaintiff requested FMLA leave related to his wife's in vitro fertility ("IVF") treatments. (Id. ¶¶ 29-30).  Defendants approved the leave for one to four absences per week, with each absence lasting one to twelve hours.  (Doc. 33-1, Def. Exh. 21 at ECF 131-132).[4]  Hershey approved this leave from January 22, 2021 through July 22, 2021.  (Id.)  The details of this leave are addressed more fully where appropriate below.

An employee who requests FMLA leave must provide a medical certification form explaining the need for the leave.  (Doc. 33-1 at ECF 127-130, Certification Forms). The employer then reviews the certification form and, if

---

[2] The FMLA is a statute which entitles eligible employees to take unpaid, job-protected leave for specified family and medical reasons. See 29 U.S.C. § 2601 et seq.
[3] As of the date of the filing of the motion for summary judgment materials, Barbara Divkovic remained employed by Defendant Hershey. (Id. ¶ 28).
[4] For clarity, the court has cited to the Electronic Case Filing (ECF) pagination where noted.

approved, files a "Designation Notice" which indicates the type of leave which will be designated as FMLA-protected.  (Id. at ECF 132).  Generally, it appears that defendants' position is that the certification completed by plaintiff's healthcare provider indicated that he would need to use the FMLA leave to drive his wife to various doctor's appointments related to IVF treatment.  Ultimately, however, the defendants noticed that plaintiff took leave at times when his wife was working, and she worked the same shift that plaintiff did.  Defendants concluded that plaintiff was abusing his FMLA leave in that his wife was working when he was supposedly on FMLA leave to drive her to appointments.

Plaintiff asserts that it was his understanding that his leave covered more than driving his wife to appointments.  He indicates that he believed the FMLA leave permitted him to prepare IVF injections of medicine at home to take to his wife so that she could inject them while she was on break at work.[5]  Eventually, Defendant Hershey noticed that plaintiff's wife was working at times that plaintiff had taken leave presumably to take her to appointments.  The local Human Relations Office contacted LaQuita Gary, the Senior Manager, Global Inclusion & Employee Experience, to determine how to proceed with a case of suspected FMLA leave abuse.  (Doc. 33, ¶ ¶ 45-46).  Gary opened an investigation on April

---

[5] Evidently, plaintiff's wife had not worked long enough for Hershey to qualify for her own FMLA leave.

3

30, 2021 and assigned Tory Niceswander, Senior Specialist, Inclusion & Employee Experience, to conduct the investigation.  (Id. ¶ 47).  Niceswander had the role of investigating issues of employee discipline and making a recommendation. (Id.)  As part of the investigation, Niceswander held an interview with plaintiff via teleconferencing.  Also in attendance were two other human resources representatives.  (Id. ¶ 49).  Plaintiff objected to the questions Niceswander asked at the interview.  He indicated that the FMLA usage questions were very personal because they included inquiries into his wife's condition, the medications they used, the dosage, how to mix the dosage, and where on her body she took the shots.  (Doc. 34, Pl. SOF ¶ 49).  The facts of this investigation/meeting are addressed more fully below.

As a result of the investigation, defendants suspended plaintiff from his employment on May 18, 2021 and terminated his employment a week later on May 25, 2021.  Plaintiff's position is that the medical certification he submitted allowed for leave to prepare the IVF-related injections.  If the certification could be construed so as not to allow such leave, plaintiff contends that he should have been allowed an opportunity to clarify the FMLA designation.

After his termination, plaintiff instituted the instant civil rights action raising the following eleven (11) causes of action:

Count 1 - Disability Discrimination in violation of the Pennsylvania Human Relations Act ("PHRA") based upon plaintiff's own disabilities of gout, anxiety, and depression;

Count 2 - PHRA Disability Discrimination/Hostile Work Environment based upon plaintiff's own disabilities;

Count 3 - PHRA Disability Retaliation based upon plaintiff's own disabilities;

Count 4 - Americans with Disabilities Act ("ADA") disability discrimination based upon plaintiff's own disabilities;

Count 5 - ADA Disability Discrimination/Hostile Work Environment regarding plaintiff's own disabilities;

Count 6 - ADA Disability Retaliation based upon plaintiff's own disabilities;

Count 7 - FMLA Interference based upon plaintiff's own disabilities and his wife's IVF treatment;

Count 8 - FMLA Retaliation based upon plaintiff's own disabilities and his wife's IVF treatments;

Count 9 - Genetic Information Nondiscrimination Act ("GINA") Violation based upon plaintiff's own disabilities and his wife's IVF treatment;

Count 10 - Invasion of Privacy – Intrusion Upon Seclusion based upon IVF treatment;

Count 11 - Negligent Supervision based upon IVF treatment.

At the close of discovery, the defendants moved for summary judgment on all of plaintiff's causes of action.  The parties have briefed their respective positions, bringing the case to its present posture.

## Jurisdiction

As several of the counts of plaintiff's complaint are brought pursuant to the ADA, 42 U.S.C. § 12101 et seq., and the FMLA, 29 U.S.C. § 2601, *et seq.*, the court has federal question jurisdiction.  See 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.").  The court has supplemental jurisdiction over the plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

## Legal Standard

Granting summary judgment is proper "'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  See Knabe v. Boury, 114 F.3d 407, 410 n.4 (3d Cir. 1997) (quoting FED. R. CIV. P. 56(c)).  "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material

fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphasis in original).

In considering a motion for summary judgment, the court must examine the facts in the light most favorable to the party opposing the motion. Int'l Raw Materials, Ltd. v. Stauffer Chem. Co., 898 F.2d 946, 949 (3d Cir. 1990). The burden is on the moving party to demonstrate that the evidence is such that a reasonable jury could not return a verdict for the non-moving party. Anderson, 477 U.S. at 248 (1986). A fact is material when it might affect the outcome of the suit under the governing law. Id. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. Celotex v. Catrett, 477 U.S. 317, 322 (1986). Once the moving party satisfies its burden, the burden then shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial. Id. at 324.

"In employment discrimination cases, the summary judgment standard 'is applied with added rigor' because 'intent and credibility are crucial issues.'" Walden v. St. Gobain Corp., 323 F. Supp. 2d 637, 641 (E.D. Pa. 2004) quoting

Stewart v. Rutgers Univ., 120 F.3d 426, 431 (3d Cir. 1997). "Employment discrimination cases center around a single question: why did the employer take an adverse employment action against plaintiff? Because this 'is clearly a factual question,' Chipollini v. Spencer Gifts, Inc., 814 F.2d 893, 899 (3d Cir. 1987), summary judgment is in fact rarely appropriate in this type of case. Simply 'by pointing to evidence which calls into question the defendant's intent, the plaintiff raises an issue of material fact which, if genuine, is sufficient to preclude summary judgment.' Id. See Sempier v. Johnson & Higgins, 45 F.3d 724, 732-33 (3d Cir. 1995) (cases in which plaintiff attacks employer's stated reasons for adverse employment action 'must be resolved by a jury and cannot be resolved on summary judgment')." Marzano v. Computer Science Corp., 91 F.3d 497, 509-510 (3d Cir. 1996).

**Discussion**

Defendants' motion for summary judgment seeks judgment on all of plaintiff's claims. The court begins its analysis with the FMLA leave issues.

The FMLA grants eligible employees the right to take up to twelve workweeks of leave in any twelve-month period if a "serious health condition ... makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The FMLA also makes it unlawful for an employer to interfere with, restrain, or deny an employee's exercise of or attempt

to exercise an FMLA right. 29 U.S.C. § 2615(a)(1).  Plaintiff raises issues of FMLA retaliation and FMLA interference.  The court will address each separately.

## 1. FMLA Retaliation Claim – Count 8

Count 8 of plaintiff's complaint alleges that defendants discriminated against him in violation of the FMLA by disciplining him and terminating his employment in retaliation for his attempt to use FMLA leave.  (Doc. 1, Compl. ¶¶ 101-111).  The court assesses such retaliation claims from the perspective of employment discrimination law because they require proof of the employer's retaliatory intent.  Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 302 (3d Cir. 2021).  Thus, the applicable analysis is provided by the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Accordingly, plaintiff must first establish a *prima facie* case of discrimination.  Once plaintiff does, the burden of persuasion shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  Then, if the employer does articulate such a reason, the burden shifts back to the plaintiff to establish that the defendants' articulated reason is merely pretext for discrimination.  Capps v. Mondelez Global, LLC, 847 F.3d 144, 151-52 (3d Cir. 2017).

To establish a *prima facie* case of  FMLA retaliation, a plaintiff must prove that:  1) he invoked a right to FMLA-qualifying leave; 2) his employer took an

adverse employment action against him; 3) a causal relation exists between the invocation of FMLA rights and the adverse employment action. <u>Fogelman v. Mercy Hosp., Inc.</u>, 283 F.3d 561, 657-68 (3d Cir. 2002).

Plaintiff's FMLA retaliation claim involves issues related to both the IVF FMLA leave and the leave plaintiff took for his own medical concerns. The court will address each in turn.

## A. Retaliation for IVF FMLA Leave

Defendants argue that plaintiff cannot establish the third element of the FMLA retaliation *prima facie* case regarding the IVF FMLA leave. This element requires plaintiff to establish a causal relation between the invocation of his FMLA rights and an adverse employment action. <u>Id.</u>

Initially, defendants argue that the undisputed evidence demonstrates that they approved all of plaintiff's numerous FMLA leave requests over several years, all without any negative repercussions. According to defendants, this past history indicates that they are not hostile to an employee taking FMLA leave and plaintiff cannot establish causation. Defendants' argument, however, is unconvincing. Although, they do cite several cases in support of their position, every case is different factually. The most that can be derived from these cases is that the defendants' attitude in the past toward FMLA leave might bolster an employer's position that they did not engage in FMLA retaliation. However,

favorable FMLA treatment in the past "by no means establishes that" a termination is not in retaliation for an FMLA leave request.  Calero v. Cardon Indus., Inc., No. 11-3192,  2012 WL 2547356 at *8 (E.D. Pa. June 29, 2012).[6]

Here, plaintiff's invocation of FMLA rights appears to be causally related to the adverse employment action, at least to a certain extent.  Indeed, it is undisputed that the FMLA leave was at least part of the reason for the termination.  Defendant would argue that it is was *misuse* of FMLA leave that led to plaintiff's suspension and eventual termination and plaintiff has not met his *prima facie* case.  The court finds, however, that whether or not plaintiff misused his FMLA leave is best addressed with regard to the second and third elements of the McDonnell Douglas framework.  The court will thus assume that the plaintiff has established his *prima facie* case of FMLA retaliation and proceed to the second step of the McDonnell Douglas analysis.

Once the plaintiff establishes a *prima facie* case, the burden of persuasion shifts to the defendants to articulate a legitimate, non-discriminatory reason for their actions.   Capps, 847 F.3d 144 at 152.  Here, defendants state that they had an honest belief that plaintiff used his leave for reasons other than its intended

---

[6] Defendants cite this case in support of their motion for summary judgment, but it is not persuasive.  In Calero, there was no evidence that the decision makers had any knowledge of the employee's request for FMLA leave.  Id.  Here, it is undisputed that the decision makers knew of plaintiff's leave requests.

purpose. (See Doc. 33, SOF ¶ 57). The law provides that an employer's honest belief that an employee uses his leave for a reason other than its intended purpose is a legitimate, non-discriminatory reason for an adverse employment action in an FMLA retaliation case. See Capps, 847 F.3d at 152 ("Where an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge.")

The facts surrounding defendants' alleged legitimate reason for its action are as follows:

Defendant Hershey employed an "Absence Management Team" who were tasked with reviewing days employees had taken as FMLA leave. (Doc. 33, SOF ¶ 33). In April 2021, two employees, Judy Mader and Morgan Hoak, reviewed plaintiff's FMLA leave days. They discovered that Hershey employed both plaintiff and his wife. (Id. ¶ 39). Upon further review, Hoak came to believe that plaintiff was not using the FMLA leave for the approved purpose of transporting his wife to doctor's appointments. (Id. 41).[7] Initially, Hershey found six days in April 2021 during which plaintiff used FMLA leave for his wife on days that his

---

[7] Plaintiff disputes this statement, to point out that that Hoak had contempt for plaintiff. (Doc. 34, ¶ 41). He does not, however, dispute that Hoak in fact believed plaintiff was misusing his FMLA leave.

wife reported for a full day of work.  Between February 14, 2021 and May 10,

2021, plaintiff used his FMLA for at least twenty (20) full days of leave when his

wife reported for a full day of work.  (Id. ¶ 44).[8]

Hoak and a co-worker notified Reese Plant's local Human Resources

representatives, Jennifer Davidick and Kristi Umberger about the leave issue.

(Id. ¶ 45).  Davidick contacted LaQuita Gary, Senior Manager, Global Inclusion &

Employee Experience, to determine the way to proceed with a case of suspected

FMLA leave abuse.  (Id. ¶ 46).  Gary opened an investigation on April 30, 2021.

(Id. ¶ 47).  She assigned Tory Niceswander, Senior Specialist, Inclusion &

Employee Experience to conduct the investigation.  (Id.)  Niceswander's role was

to investigate the matter and issue a recommendation on any disciplinary action.

(Id.)

To assist in the investigation, Hoak provided Niceswander with some of

plaintiff's FMLA documents and her analysis of the plaintiff's FMLA use compared

to his wife's attendance at work.  (Id. ¶ 48).  Hoak had no further involvement in

the investigation or in the subsequent discussions involving plaintiff's

employment.  (Id.)[9]

---

[8] Plaintiff again disputes these facts, but provides no counter evidence.  Plaintiff merely argues that not all days he took off were to transport his wife to appointments as he was needed to "make" medication and deliver it to his wife at work.  (Doc. 34, ¶ 44).
[9] Plaintiff disputes paragraph 48 of defendants' SOF, but only to the extent that he again points out his belief that Hoak was contemptuous toward the plaintiff, and to highlight Hoak's assertion that if plaintiff had any questions about what was approved as FMLA leave he could

Niceswander conducted an investigative interview with plaintiff on May 18, 2021 via teleconference. (Doc. 34, Pl. CSOF ¶ 49). Also present for the interview were Umberger of the defendants' local Human Resources Department and Laura Seitchik, Senior Specialist, Inclusion and Employee Experience. (Doc. 33, Def. SOF ¶ 49).

At the interview, plaintiff indicated that he believed that his FMLA leave certification allowed him to use leave to prepare his wife's medications at home and deliver them to her at Hershey, in addition to providing transportation to appointments, and moral support. (Id. ¶ 50). Plaintiff's description of his FMLA leave is not consistent with his health care provider's FMLA certification or Hershey's FMLA designation.

At this point, it is important to review plaintiff's FMLA certification. The certification form plaintiff submitted to Hershey is comprised of four pages. The first page appears to have been completed by plaintiff himself and the remainder was completed by his wife's IVF health care provider. On the first page when asked to describe the care that his family member needed, plaintiff wrote: "for support, going to appointments, during procedures, helping inject medications. Driving my wife back and forth for bloodwork & ultrasound and different

_____

have received additional information. (Doc. 34, Pl's CSOF ¶ 48). Accordingly, the court deems this fact admitted.

14

procedures during our process." (Doc 33-1, ECF 127). Notably, "helping inject medications" is listed as part of the care plaintiff claimed that he needed to provide. The remainder of the form, completed by the health care provider discusses only the need for plaintiff to drive his wife to appointments when she could not drive due to medication. (See id. ECF 129). The health care provider does not mention a need for plaintiff to assist in injecting medicines.

Specifically, Defendant Hershey's FMLA "Designation Notice" indicates that plaintiff's FMLA leave was: "Approved for 1-4 absences/wk., with each absence lasting 1-12 hours in length. Approval effective 1/22/21 – 7/22/21 (To transport spouse to appointments)" (Doc.33-1, ECF 132). This approval is in line with the health care provider's certification discussed above. The designation does not mention any approval of leave for plaintiff to assist his wife with injections of medicine. Plaintiff, however, indicated that he did take leave to assist with injections.

When Niceswander pressed plaintiff on the details of the reasons for taking leave, the interview became somewhat antagonistic. Plaintiff indicated that he thought the questions were too intrusive upon his privacy and the IVF treatments. Plaintiff became angry. (Doc. 33, ¶ 55). During the interview plaintiff said something to the effect of: "We can go there. I am from a war zone country." (Doc. 35-7, Gray Dep. at ECF 28). Niceswander felt threatened by the comment

and Umberger and Seitchik felt plaintiff was off-putting and exhibited behavior not expected from an employee.  (Id.)  Plaintiff later indicated that this statement was not meant to be threatening, but to demonstrate that he did not come to the United States to be disrespected.  (Id.)

Before the end of the interview, plaintiff asked to speak to Niceswander's manager regarding Niceswander's conduct. (Doc. 33, Id. ¶ 59).  Niceswander informed his manager, Gary, who had a conversation with plaintiff the following day.  (Id. ¶ 60).  Plaintiff stated to Gary that his FMLA leave was for transportation, emotional support, and preparation of medication. (Id. ¶ 63). Gary informed him that the leave was approved only for driving his wife to appointments.  (Id. ¶ 64).

Plaintiff admitted during the interview that not all of his thirty-two (32) leave days, including full and partial days, were for the transportation of his wife to appointments.  (Id. ¶ 52).  Additionally, plaintiff stated that he took off full shifts on days he allegedly helped with his wife's injections, even though he admitted that it took only about thirty (30) minutes to mix the medicine.  (Doc. 35, Niceswander Dep. at ECF 57).

Because the medical certification/designation for plaintiff's FMLA leave only provided leave for plaintiff to transport his wife to appointments, these admissions and the defendants' investigation certainly provide a basis for the

defendants to form an honest belief that plaintiff misused his FMLA leave. Thus, the court finds that the defendants have provided a nondiscriminatory justification for the adverse employment action at issue. See Capps, 847 F.3d at 152 ("Where an employer provides evidence that the reason for the adverse employment action taken by the employer was an honest belief that the employee was misusing FMLA leave, that is a legitimate, nondiscriminatory justification for the discharge.")

Once the defendants provide a legitimate, nondiscriminatory reason for the employment action, the burden of persuasion shifts back to the plaintiff to establish that the defendants' articulated reason is merely pretext for discrimination. Id.

Here, plaintiff attacks the defendants' legitimate nondiscriminatory reason in several ways. Principally, it appears that plaintiff argues that instead of terminating his employment, the defendants had a duty to ask plaintiff to seek clarification from his doctor regarding the FMLA certification. Defendants' position is that plaintiff bore the responsibility of seeking clarification or re-certification if he so desired. After a careful review, the court agrees with the defendants that they had no duty to ask plaintiff to clarify his certification.

Here, both Gary and Niceswander indicated that plaintiff bore the responsibility of seeking recertification. Plaintiff argues that in Capps, supra, the

employer had allowed the employee ample time to obtain physician clarification prior to making its "honest belief" decision. (Doc. 35, Pl.'s Br. at ECF 9). A review of the Capps opinion, however, reveals that plaintiff has misstated the facts of that case. No indication is provided in the Capps opinion that the employer allowed the plaintiff additional time to obtain physician clarification. Accordingly, plaintiff's reliance on Capps is unconvincing. Capps is the sole authority that plaintiff relies upon to support his position that he should have been allowed to obtain physician clarification. The court thus rejects plaintiff's argument on this point.[10]

Plaintiff also complains about Niceswander's investigation. According to the plaintiff, Niceswander did not investigate whether he truly was providing medication to his wife on the FMLA leave dates as he claimed. Niceswander admitted that he did not try to confirm this statement as he found it unworthy of credence. Niceswander found the plaintiff's assertion incredible because access to the facility where plaintiff's wife worked, the West Hershey Plant, was limited. (Doc. 35-10, Niceswander Dep. At 31). An employee cannot easily access that facility unless he works there, and although plaintiff's wife worked there, plaintiff

---

[10] Regardless, a week passed between plaintiff's suspension and his termination. Nothing in the record indicates that during this time plaintiff sought clarification from his physician, presented such clarification to the defendants, or indicated to the defendants that he wanted to seek clarification.

himself did not. (Id. at ECF 57-58). Moreover, plaintiff's FMLA certification did not allow plaintiff leave to bring medications to his wife. (Id.) Thus, the fact that Niceswander did not engage in a more detailed investigation does not raise an inference of discrimination.

Notably, a more robust investigation would not necessarily have proved favorable to the plaintiff. During the discovery phase of this case, the defendants received medical records which revealed that on approximately twenty-five (25) of plaintiff's FMLA leave days, his wife had neither appointments nor medication injections. (Doc. 33, SOF ¶ 85). [11] Thus, plaintiff took leave for appointments, which was appropriate, and leave to mix medication, which plaintiff understood to be appropriate. Additionally, plaintiff took twenty-five (25) days of leave when plaintiff's wife had neither appointments nor medicine injections. The reasons for these days of leave are not explained in the record. Regrettably, for plaintiff, a more thorough investigation may have led to additional reasons to discipline him for abuse of FMLA leave.

Plaintiff also complains that Niceswander made his decision before investigation took place and prepared a script for his interview with plaintiff.

---

[11] Plaintiff disputes this fact, but only with general information regarding Plaintiff's wife care. (See Doc. 34, ¶ 85 (referring to ¶ 75). He does not address the dates specifically set out in defendants' statement of facts. Accordingly, the court deems this paragraph of the defendants' statement of facts as admitted.

(Doc. 35-10, Niceswander Dep. at 47). Plaintiff attempts to use the script and an alleged intent to suspend the plaintiff even before the interview as evidence that defendants discriminated against him. Discriminatory intent cannot be inferred merely because Niceswander prepared a script for use in the interview, including questions and potential outcomes. Niceswander did not deny using the script and adding notes to it during the interview. (Id. at 48). The presence of this "script" does not raise an inference of retaliatory animus.

At most, plaintiff may have established that Niceswander had decided to suspend the plaintiff before he talked to him. That fact alone, even if proved, does not indicate a discriminatory intent. A decision to suspend the plaintiff, even if it came before his interview, does not equate with a decision to suspend the plaintiff for discriminatory reasons.

Accordingly, plaintiff has not raised a genuine issue of material fact as to whether defendants violated his rights under the FMLA concerning the leave he had with regard to the IVF treatments. Judgment will be granted to the defendants on this issue.

## B. Retaliation Regarding FMLA Leave for Plaintiff's Own Needs

This case, however, involves two distinct FMLA claims: 1) the previously discussed leave with regard to the IVF treatments; and 2) the FMLA leave

regarding plaintiff's own disabilities, which include gout flare-ups, anxiety and depression. (See, e.g., Doc. 1 Compl. 43).

Plaintiff obtained certification for FMLA for his own needs from approximately September 2018 through September 2020. (Doc. 33-1, Def. Exh. 8, ECF 93-94; Doc. 33-1, Def. Exh. 15, ECF 108-09). This series of FMLA leave certifications expired approximately four to five months before he obtained the certification/designation for the leave regarding the IVF treatments and approximately eight months before his termination. Plaintiff took leave as needed during this period, with no evidence cited in the record to indicate that defendants acted inappropriately.

Plaintiff's position is that defendants retaliated against him after he expressed an intention to re-certify the FMLA leave for his own personal issues during the May 2021 interview with Niceswander. Plaintiff alleges that defendants terminated him within seven (7) days of raising the issue of seeing his doctor again to recertify his FMLA and the previous accommodation. (Doc. 35, Pl.'s Oppo. Br. at 9). The record fails to support plaintiff's position.

As noted above to establish FMLA retaliation, plaintiff must first establish a prima facie case comprised of the following elements: 1) he invoked a right to FMLA-qualifying leave; 2) an adverse employment action by the employer against the employee; 3) a causal relation between the invocation of FMLA rights

and the adverse employment action. <u>Fogelman</u> 283 F.3d at 657-68. Plaintiff's FMLA retaliation claim with respect to the leave for his own needs fails at the first step, he did not invoke a right to FMLA-qualifying leave.

Plaintiff claims that he indicated at the interview with Niceswander that he intended to recertify the FMLA leave he had for himself. In support of this position, plaintiff cites to the Niceswander's deposition. (<u>Id.</u>) This evidence, however, does not support the plaintiff's position and is very circuitous.

At the deposition, Niceswander was questioned about notes he had taken at plaintiff's interview on May 18, 2021. Niceswander's notes indicate that he asked plaintiff who the FMLA leaves were for, himself or a family member and when they were approved for coverage. (Doc. 35-10, Niceswander Dep. At ECF 22). Plaintiff responded, per the notes, that the leaves were for himself and his wife. Plaintiff further indicated that his personal FMLA leave expired in March or April[12] and that "I don't really have any use for it anymore." (<u>Id.</u>) When asked if he recertified the leave for his own needs, plaintiff indicated, "I haven't seen my doctor. I was supposed to see him in two months or so." (<u>Id.</u> at ECF 23).

Plaintiff would have the court interpret this evidence to mean that plaintiff still needed his individual leave and intended to visit his doctor about it in two months. The court is unconvinced.

---

[12] As noted above, this FMLA leave designation had expired in September 2020.

Even when viewed in the light most favorable to the plaintiff, this evidence does not support his position that he indicated to Niceswander that he intended to recertify the FMLA leave for his own needs. Plaintiff stated that "he really didn't need the leave anymore" and is clearly speaking about the leave for his own conditions, not the IVF leave. Additionally, he had at some point planned to see his doctor in "two months", but the leave had expired approximately eight (8) months earlier in September 2020.

Thus, the evidence plaintiff presents does not meet the first element of an FMLA retaliation claim. He did not invoke FMLA-qualifying leave regarding the May 2021 interview.

As further evidence that defendants' retaliated against him for his own leave, Plaintiff states that he *believed* that at the May interview he was being retaliated against due to the leave he took months earlier for his own needs. Such a subjective belief is insufficient to meet the plaintiff's burden of establishing a *prima facie* case. See Naber v. Dover Healthcare Assocs., Inc. 765 F. Supp. 2d 622, 635 (E.D. Pa. 2011) ("[P]laintiff's belief that she was a victim of retaliation is similarly insufficient to satisfy her burden of proof.")

Thus, plaintiff has not met the *prima facie* elements of an FMLA retaliation claim. Even if he had, and the court continued the analysis of the McDonnell Douglas factors, plaintiff's claim would fail based upon the defendants' honest

23

belief regarding FMLA leave misuse as set forth above.  In other words, merely because plaintiff indicated that he intended to attempt to recertify FMLA for his own needs does not negate the fact that defendants possessed an honest belief that he abused his FMLA leave.  Furthermore, plaintiff has provided no evidence to demonstrate that the reason defendants provided for his discipline/termination is merely pretext for discrimination.

For these reasons, the court will also grant summary judgment to the defendants on Count 8, FMLA retaliation based on the FMLA leave he took for his own needs.

## 2.  FMLA Interference Claim – Count 7

Count 7 of plaintiff's complaint alleges a claim for FMLA interference against the defendants.  (Doc. 1, Compl. ¶¶ 78-100).  Plaintiff avers that the defendants failed to provide him the FMLA leave of absence without discrimination, harassment, and retaliation.  (Id. ¶ 91).  As alleged, "[i]nstead, Defendants interfered with Plaintiff's FMLA once he made it known of his need for leave and workplace accommodations, and ultimately, discharged Plaintiff from his job."  (Id. ¶ 92).

Defendant argues that judgment should be granted to them on the FMLA interference claim because it is redundant to the FMLA retaliation claim. The Third Circuit Court of Appeals, however, has held that "firing an employee for a

valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee." Erdman v. Nationwide Ins. Co., 582 F.3d 500, 509 (3d Cir. 2009). While the Third Circuit has noted that an FMLA interference claim and an FMLA retaliation claim are not necessarily redundant to each other, in this case, judgment will be granted to the defendants for the same reason on both counts.

To establish an FMLA interference claim, a plaintiff must prove that "(1) []he invoked h[is] right to FMLA-qualifying leave, (2) [ ]he suffered an adverse employment decision, and (3) the adverse action was causally related to h[is] invocation of rights." Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 301-02 (3d Cir. 2012).

Plaintiff claims that the defendant interfered with his FMLA leave rights by discouraging him from using FMLA, by disciplining him and ultimately discharging him after he sought to assist his and his wife's serious medical conditions. (Id. ¶ 95a). Defendants argue that because they granted all of plaintiff's requests for FMLA leave, he cannot recover on an FMLA interference claim. Based on the facts as set forth above, the defendants' argument is convincing. It is undisputed that they granted all the leave plaintiff sought. While plaintiff was discharged before his leave expired, defendants had an honest belief that he was misusing the FMLA leave. Nothing in the FMLA or the caselaw interpreting it provides that

an employee must be kept employed until his FMLA certification/designation-period ends if the employer believes he is misusing the leave. Accordingly, substantially for the same reasons that plaintiff's FMLA retaliation claim fails, his FMLA interference claim fails. Judgment will be granted to the defendants on plaintiff's FMLA interference claim.

### 3. ADA and PHRA Claims – Counts 1-6

Counts 1 through 3 of plaintiff's complaint assert claims for disability discrimination under the Pennsylvania Human Relations Act, 43 PA. STAT. § 951 et seq. ("PHRA") (Doc. 1, ¶¶ 42-47). Counts 4 through 6 assert similar claims for disability discrimination under the Americans with Disabilities Act, ("ADA"), 42 U.S.C. § 12101 et seq. Defendants seek judgment on these claims on the basis that plaintiff has no evidence of discrimination. Disability discrimination claims under the PHRA are treated as coextensive with ADA claims. Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996). Thus, the court will address the claims using ADA law and the same analysis will apply to the PHRA claims.

Count 4 alleges disability discrimination, failure to accommodate. Count 5 alleges ADA disability hostile work environment, and Count 6 alleges ADA disability retaliation.[13] All of these counts deal with a period of FMLA leave and

---

[13] Counts 1, 2, and 3 allege the PHRA analogues to Counts 4, 5, and 6.

accommodation that plaintiff sought for his own disability and not for the period of FMLA leave discussed above regarding the FMLA related to the IVF treatments.

The court will address each cause of action separately.

## A. Disability Discrimination

Count 4 of the plaintiff's complaint alleges that plaintiff had a record of disability and/or was regarded as disabled by the defendants. (Doc. 1, ¶ 62). According to the complaint, instead of accommodating the plaintiff's disability as required under the law, the defendants disciplined and fired him. (Id. ¶ 65). Defendants argue that plaintiff has no proof of disability discrimination and that judgment should be granted in defendants' favor on Count 4. After a careful review, the court agrees with the defendants.

To state a claim for ADA discrimination, the plaintiff must establish the following: 1) he is disabled within the meaning of the ADA; 2) he can perform the essential functions of his job with or without reasonable accommodations; and 3) he suffered a refusal to make reasonable accommodations. Hohider v. UPS, Inc., 574 F.3d 169, 186 (3d Cir. 2009).

Defendants allege that plaintiff cannot establish the *prima facie* elements because defendants granted his only accommodation request. Plaintiff's complaint indicates that due to gout flare ups, anxiety, and depression, he requested that Hershey place him on a forty-hour per week work restriction and

27

Hershey did so.  (Doc. 1, Compl. ¶¶ 15-16, 61).  At his deposition, plaintiff stated that Hershey granted this request for an accommodation.  (Doc. 33, SOF ¶ 24, Doc. 33-1, Pl.'s Dep. ECF 19).

Plaintiff's brief in opposition to the defendants' summary judgment motion does not address this issue.  Plaintiff thus has not established the elements of a *prima facie* case because he cannot demonstrate that he suffered from a refusal to make an accommodation.  Rather, the record indicates that defendants granted his request for an accommodation regarding his disability. (Id.)  The court will grant summary judgment to the defendants on this claim.

## B.  ADA Retaliation

Count 6 of plaintiff's complaint asserts an ADA retaliation claim.  (Doc. 1, Compl.  ¶¶ 72-77).  This count also relates to plaintiff's own disabilities, not to the leave he sought to care for his wife.  (Id. ¶ 75).

To establish a prima facie case of illegal retaliation under the ADA, a plaintiff must prove: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." Fogleman, 283 F.3d  567–68 (quoting Krouse v. Am. Sterilizer Co., 126 F.3d 494, 500 (3d Cir. 1997)).

If the plaintiff establishes a *prima facie* case of ADA retaliation, the burden

shifting analysis of McDonnell Douglas also applies.  Specifically,

> [T]the burden shifts to the employer to advance a legitimate, non-
> retaliatory reason for its adverse employment action. The employer's
> burden at this stage is relatively light: it is satisfied if the defendant
> articulates any legitimate reason for the adverse employment action;
> the defendant need not prove that the articulated reason actually
> motivated the [action].
>
> If the employer satisfies its burden, the plaintiff must be able to
> convince the factfinder both that the employer's proffered explanation
> was false, and that retaliation was the real reason for the adverse
> employment action. The plaintiff must prove that retaliatory animus
> played a role in the employer's decisionmaking process and that it had
> a determinative effect on the outcome of that process. The burden of
> proof remains at all times with the plaintiff.

Krouse, 126 F.3d at 500-501 (internal citations, quotation marks, and editing
marks omitted).

Here, plaintiff claims that his protected ADA activity was "Plaintiff had

sought and received accommodation as to a 40-hour work week, as well as

FMLA for himself claiming he was recertifying for same in about two months."

(Doc. 35, Pl. Opp. Br. at 9).  Plaintiff did seek a 40-hour work week

accommodation for his disabilities in July 2020, and he admitted in his deposition

that this, his only disability accommodation, was granted.  (Doc. 33-1, Defs.' Exh.

1, Pl. Dep. ECF 43).

The same analysis regarding the FMLA retaliation claim applies here.

Defendants had an honest belief that plaintiff was misusing his FMLA leave and

disciplined/terminated him. Plaintiff has presented no evidence that the reason provided by the defendants is false and that retaliation was the real reason for the adverse employment actions. Accordingly, summary judgment will be granted to the defendants on this claim.

### C. Hostile Work Environment – Disability

Count 5 of plaintiff's complaint alleges an ADA disability hostile work environment claim. Defendants move for judgment on this claim.

A plaintiff establishes a *prima facie* case of ADA disability hostile work environment when he demonstrates the following:

1) he is a qualified individual with a disability under the ADA;

2) he was subjected to unwelcome harassment;

3) the harassment was based upon plaintiff's disability or a request for an accommodation; and

4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive work environment; and

5) the employer knew or should have known of the harassment and failed to take prompt effective remedial action.

Walton v. Mental Health Ass'n of Se. Pa., 168 F.3d 661, 667 (3d Cir. 1999). "To prove an 'abusive work environment' under Title VII, the environment must be

shown to be objectively hostile or abusive, and the plaintiff must have perceived it as a hostile or abusive environment." Id.

Plaintiff has not briefed this issue. He points to no evidence that he experienced a severe or pervasive abusive work environment. In fact, at his deposition, he indicated that he was very happy working at Hershey until he was questioned about the leave he took to care for his wife's needs at the interview in May 2021. (Doc. 33-1, Exh. 1, Pl.'s Dep. at 78). Accordingly, judgment will be granted to the defendants on this claim.

### 4. GINA Disability Claim – Count 9

Count 9 of plaintiff's complaint asserts a cause of action under the Genetic Information Non-Discrimination Act, ("GINA"), 42 U.S.C. § 2000ff, et seq. Next defendants move for summary judgment on plaintiff's GINA claim on the basis that plaintiff has no evidence of such discrimination.

GINA's provision against "[d]iscrimination based on genetic information," 42 U.S.C. § 2000ff-1(a), provides that

It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire, or to discharge, any employee, or otherwise to discriminate against any employee with respect to the compensation, terms, conditions, or privileges of employment of the employee, because of genetic information with respect to the employee; or
(2) to limit, segregate, or classify the employees of the employer in any way that would deprive or tend to deprive any employee of employment opportunities or otherwise adversely affect the status of

31

the employee as an employee, because of genetic information with respect to the employee.

Section 2000ff (4) (A) defines "genetic information" as "information about—(i) such individual's genetic tests, (ii) the genetic tests of family members of such individual, and (iii) the manifestation of a disease or disorder in family members of such individual." The court therefore "review[s] the complaint to determine whether Plaintiff has pleaded and plausibly supported, at least, (1) that [he] was an employee; (2) who was discharged or deprived of employment opportunities; (3) because of information from Plaintiff's genetic tests." Leone v. N. Jersey Ortho Specialists, P.A., Civil Action No. 11–3957 (ES) 2012 WL 1535198 *5 (D.N.J. Apr. 27, 2012).

Pursuant to GINA, "genetic information" means information about the "genetic tests" of an individual or family members, and information about the "manifestation of a disease or disorder in family members of such individual." Id. § 2000ff(4)(A). "Genetic test," in turn, "means an analysis of human DNA, RNA, chromosomes, proteins, or metabolites, that detects genotypes, mutations, or chromosomal changes." Id. § 2000ff(7)(A).

The facts of the instant case do not give rise to a cause of action under the law. Plaintiff cites to no genetic information as defined by GINA. He cites to the IVF treatment of his wife and medications related thereto. While there may be a genetic component as to why the plaintiff and his wife were engaged in IVF

treatment, this is not the type of claim contemplated by GINA. Plaintiff has presented no information from which a factfinder could infer that defendant discharged him from employment based upon genetic tests. Accordingly, the court will grant summary judgment to the defendants on Count 9.

## 5. Common Law Intrusion Upon Seclusion Claim – Count 10

Count 10 of the plaintiff's complaint asserts a Pennsylvania common law claim for invasion of privacy/intrusion upon seclusion. Plaintiff claims that the defendants intentionally entered upon his solitude and seclusion by questioning him regarding the IVF treatments. (Doc. 1, ¶¶ 125-130). Summary judgment will be granted to the defendants on this count.

The Third Circuit Court of Appeals has explained Pennsylvania law regarding intrusion upon seclusion as follows:

> To state a claim for intrusion upon seclusion, plaintiffs must allege conduct demonstrating "an intentional intrusion upon the seclusion of their private concerns which was substantial and highly offensive to a reasonable person, and aver sufficient facts to establish that the information disclosed would have caused mental suffering, shame or humiliation to a person of ordinary sensibilities."

Boring v. Google, Inc., 362 F. App'x 273, 278-79 (3d Cir. 2010) (quoting Pro Golf Mfg., Inc. v. Tribune Review Newspaper Co., 809 A.2d 243, 247 (Pa. 2002)).

Plaintiff here sought leave to assist his wife with IVF treatments. The defendants questioned him about the treatments in evaluating his leave. Because it related to the leave in question, such questioning did not

inappropriately intrude upon plaintiff's seclusion. Plaintiff has not pointed to any information obtained by the defendants here that would have caused suffering, shame or humiliation to a person of ordinary sensibilities.  Accordingly, the court will grant summary judgment to the defendants on Count 10.

## 6. Common Law Negligent Supervision Claim – Count 11

Plaintiff sets forth a claim for negligent supervision in Count 11 of his complaint.  (Doc. 1, ¶¶ 131-138).  This count alleges that defendants intruded upon plaintiff's private medical information and mental health conditions and communicated same to human resources, corporate relations, and other supervisors and third parties from May 18, 2021 through May 25, 2021 and beyond.  (Id. ¶ 133).  Defendant seeks judgment on this count on the basis that plaintiff cannot establish the elements of a negligent supervision claim.

The Third Circuit Court of Appeals has explained the law with regard to negligent supervision as follows:

> To recover for negligent supervision under Pennsylvania law, a plaintiff must prove that his loss resulted from (1) a failure to exercise ordinary care to prevent an intentional harm by an employee acting outside the scope of his employment, (2) that is committed on the employer's premises, (3) when the employer knows or has reason to know of the necessity and ability to control the employee. Dempsey v. Walso Bureau, Inc., 431 Pa. 562, 246 A.2d 418, 420 (1968); Heller v. Patwil Homes, Inc., 713 A.2d 105, 107–08 (Pa. Super. Ct. 1998).

> Negligent supervision requires the four elements of common law negligence, i.e., duty, breach, causation, and damages.  Brezenski v. World Truck Transfer, Inc., 755 A.2d 36, 42 (Pa. Super. Ct. 2000)

34

(citing RESTATEMENT (SECOND) OF AGENCY § 213 cmt. a). It is specifically predicated on two duties of an employer: the duty to reasonably monitor and control the activities of an employee, and the duty to abstain from hiring an employee and placing that employee in a situation where the employee will harm a third party. See Hutchison v. Luddy, 560 Pa. 51, 742 A.2d 1052, 1059–60 (1999) (affirming the applicability of common law negligence and discussing the duty of an employer articulated in Section 317 of the Restatement).

Belmont v. MB Inv. Partners, Inc., 708 F.3d 470, 487-89 (3d Cir. 2013).

Plaintiff's negligent supervision claim deals with Niceswander's investigation into his FMLA leave in May of 2021. (Doc. 1, Compl. ¶¶ 131-138). As noted above, however, plaintiff has no claim for intrusion upon seclusion with regard to Niceswander's investigation. No evidence has been presented that Niceswander acted outside the scope of his employment in conducting the investigation. Accordingly, his actions cannot support a negligent supervision claim.

## 7. Damage Limitation Based Upon After-Acquired Information

Finally, defendants argue that even if their motion is denied with regard to plaintiff's substantive claims, the court should rule that his damages are limited pursuant to the after-acquired evidence doctrine. As the court will grant judgment to the defendants, no need exists to address a limitation to any damages.

35

## Conclusion

After a careful review of the pleadings, the parties' briefs, the statements of material fact, and the evidence presented in this case, the court concludes that defendants acted appropriately and within the bounds of the FMLA when they terminated plaintiff with an honest belief that he had misused the FMLA leave. Additionally, the evidence of record does not raise an issue of genuine material fact regarding the various disability causes of action, and the state law causes of action. Accordingly, for the reasons set forth above, the defendants' motion for summary judgment will be granted. An appropriate order follows.

Date: 3/21/25

JUDGE JULIA K. MUNLEY
United States District Court